**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

August 07, 2025

LAURA A. AUSTIN, CLERK
BY: /s/ S. Wray
DEPUTY CLERK

| | | |
|---|---|---|
| 12 Marketing, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:24-cv-00660 |
| v. | ) | |
| | ) | |
| Shannon Ashworth White, et al., | ) | By: Hon. Robert S. Ballou |
| | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Defendants Shannon Ashworth White, Brooke Ashworth, Johnny White and Direct

Outsource Telemarketing, LLC (the "Ashworth Defendants") move to dismiss Plaintiff 12

Marketing's complaint for lack of personal jurisdiction which is **DENIED**. The Ashworth

Defendants also move to dismiss 12 Marketing's complaint in part under Federal Rule of Civil

Procedure 12(b)(6). This motion is **DENIED IN PART** and **GRANTED IN PART**. Defendant

Shira Calloway moves to dismiss 12 Marketing's complaint in part under Rule 12(b)(6). Her

motion is **DENIED.**

I.      **Background**

Plaintiff 12 Marketing LLC is a telemarketing company based in Salem, VA. It has two

members—Whitwell Kelly, domiciled in Virginia, and James Houston, domiciled in South

Carolina. In December 2022, 12 Marketing purchased the "inventory, equipment, intellectual

property, client lists, and other assets owned by Grindstone, Inc., another telemarketing

company." As part of the purchase, Grindstone, Inc.'s former owners agreed not to "(1) compete

against [Grindstone], (2) interfere with any contractual or client relationship of the [Grindstone];

(3) take any action that a reasonable person may reasonably expect would result in diminution of [Grindstone], or (4) solicit clients of [Grindstone] for services competitive to the [Grindstone]."

After the purchase, 12 Marketing now d/b/a Grindstone retained Defendants Shannon Ashworth White, Brooke Ashworth, and Shira Calloway. Shannon, who was employed by and had an ownership interest in Grindstone presale, was the General/Operations Manager and was responsible for "interaction with clients, management of the telemarketers . . . , conducting sales, and management of existing accounts." Calloway, who was also employed by Grindstone presale, was responsible for "writing call scripts, formulating call campaigns, management of call campaigns, coaching telemarketers and some client interaction." At Shannon's suggestion, 12 Marketing hired her daughter, Brooke, to assist with Plaintiff's social media marketing and sales. 12 Marketing alleges that Brooke "reviewed client lists, contacted clients, and followed up on client leads."

12 Marketing asserts that during an August 2023 meeting in Alexandria, Virginia Shannon, Brooke, and Johnny White, Shannon's husband "made false and/or misleading statements that were intended to make Plaintiff believe that they were interested in growing Plaintiff's business." However, 12 Marketing later learned that prior to the meeting, on December 6, 2022, Johnny registered a competing business, Direct Outsource, in Arkansas. Shannon, Brooke and Calloway all resigned from 12 Marketing by October 2023.

12 Marketing alleges that prior to leaving their employment, Defendants solicited its clients and built a competing business—Direct Outsource. For example, Defendants forwarded emails they received on their 12 Marketing accounts to Direct Outsource; introduced Direct Outsource to 12 Marketing's clients as a subcontractor, which was false; used 12 Marketing's confidential information, including client lists, to solicit business for Direct Outsource; and

intentionally failed to provide services to 12 Marketing's clients to encourage them to move to Direct Outsource. Plaintiff also alleges that Defendants solicited/had numerous meetings with its clients/potential clients in order to benefit Direct Outsource. As a result, 12 Marketing alleges, "Plaintiff has lost clients that have instead engaged Direct [Outsource] for the same or materially similar work."

Additionally, 12 Marketing alleges that Shannon recruited the company's veteran telemarketers to work for Direct Outsource. It states, "upon information and belief, as a direct result of Shannon's and the other Defendants' similar conduct, Plaintiff lost a number of its most veteran telemarketers that Direct has since hired."

12 Marketing asserts fives causes of action:

- Count I: Violation of the Defend Trade Secrets Act ("DTSA") against all Defendants

- Count II: Violation of the Virginia Uniform Trade Secrets Act ("VUTSA") against all Defendants

- Count III: Breach of Fiduciary Duty and Breach of Duty of Loyalty against Defendants Shannon, Brooke, Calloway and Direct

- Count IV: Tortious Interference with Business Relationships against all Defendants

- Count V: Statutory Conspiracy against all Defendants

The company seeks compensatory damages in the amount of $500,000, punitive damages in the amount of $350,000, a permanent injunction and attorneys' fees and costs.

The Ashworth Defendants filed a motion to dismiss for lack of jurisdiction and moved to dismiss the VUTSA and DTSA claims, Plaintiff's requests for attorneys' fees and exemplary damages under DTSA, and the statutory conspiracy claim. The Ashworth Defendants also moved to dismiss the tortious interference claims as to Johnny. Defendant Calloway seeks dismissal of

the DTSA, VUTSA, statutory conspiracy, and the tortious interference claims.[1] The Court held a

hearing on the motions on February 25, 2025.

## II.    Standards of Review

Under Fed. R. Civ. P. 12(b)(2), a defendant may move to dismiss a complaint for lack of

personal jurisdiction. "Where, as here, the district court addresses the question of personal

jurisdiction on the basis of motion papers, supporting legal memoranda, and the allegations in the

complaint," the plaintiff need only make a prima facie showing that personal jurisdiction exists

over the moving defendant. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th

Cir. 2009). In making this determination, the "court must take all disputed facts and reasonable

inferences" in the plaintiff's favor. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334

F.3d 390, 396 (4th Cir. 2003); *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

Similarly, under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint

for failure to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.

at 555 (noting that while detailed factual allegations are not required, a plaintiff must still

provide more than labels, conclusions, or a "formulaic recitation of the elements of a cause of

action")). In evaluating a Rule 12(b)(6) motion, the court must accept all factual allegations in

the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Id.* (citing

*Twombly*, 550 U.S. at 556). However, legal conclusions are not entitled to the same presumption

---

[1] Calloway also moved to dismiss 12 Marketing's breach of fiduciary duty claim. Dkt. 26 at 8–
11. However, counsel withdrew the argument during the motions hearing.

of truth. *Id.* A court should only grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable actual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

### III.    Analysis

#### A.  The Ashworth Defendants' Motion to Dismiss for Lack of Personal Jurisdiction

The Ashworth Defendants move to dismiss the Complaint for lack of personal jurisdiction, because they lack sufficient minimum contacts with Virginia. Dkt. 23. I find 12 Marketing has adequately alleged that Defendants Shannon and Brooke "purposefully availed" themselves of the privilege of conducting activities in Virginia. Accordingly, the court has personal jurisdiction over these Defendants. In contrast, 12 Marketing has failed to allege that Defendants White and Direct Outsource have sufficient minimum contacts with Virginia. However, these defendants are still subject to the Court's personal jurisdiction under a "conspiracy theory of jurisdiction."

#### 1.    Individual Contacts with Virginia

"[A] federal court may exercise personal jurisdiction over a defendant in the manner provided by state law." *Carefirst of Maryland*, 334 F.3d at 396 (4th Cir. 2003). "Thus, for a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Id.* (citation omitted). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the

statutory inquiry merges with the constitutional inquiry." *Consulting Eng'rs Corp*, 561 F.3d at 277.

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst of Maryland*, 334 F.3d at 397. "If those contacts form the basis for the suit, they may establish 'specific jurisdiction.'" *Id.* "In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711–12 (4th Cir. 2002)). "If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state. To establish general jurisdiction, the defendant's activities in the state must have been 'continuous and systematic.'" *Id.* (quoting *ALS Scan*, 293 F.3d at 712).

Here, the Parties agree that the court lacks general jurisdiction over Defendants and thus, Plaintiff must demonstrate specific jurisdiction. Dkt. 31. Therefore, the Court must consider whether and to what extent each of the Ashworth Defendants "purposefully availed [themselves] of the privilege of conducting activities in [Virginia]." *Carefirst of Maryland*, 334 F.3d at 396. In so doing, the Court considers the following, nonexclusive, factors: 1) "whether the defendant maintains offices or agents in the forum state;" 2) "whether the defendant owns property in the forum state;" 3) "whether the defendant reached into the forum state to solicit or initiate business;" 4) "whether the defendant deliberately engaged in significant or long-term business

6

activities in the forum state;" 5) "whether the parties contractually agreed that the law of the

forum state would govern disputes;" 6) "whether the defendant made in-person contact with the

resident of the forum in the forum state regarding the business relationship;" 7) "the nature,

quality and extent of the parties' communications about the business being transacted;" and 8)

"whether the performance of contractual duties was to occur within the forum." *Consulting

Eng'rs Corp.*, 561 F.3d at 278.

These factors weigh in favor of finding personal jurisdiction over Shannon and Brooke.

Plaintiff alleges that Shannon was employed by 12 Marketing, a Virginia based company with a

Virginia owner, Dkt. 21 ¶¶ 1–2, did work for Virginia based clients, Dkt. 31-1 ¶ 9,

communicated, by telephone and videoconference, with 12 Marketing's Virginia-based owner,

*Id.* ¶ 7, and, ultimately, traveled to Alexandria, VA to meet with Plaintiff, Dkt. 21 ¶¶ 26–27. Her

employment with 12 Marketing and her work for 12 Marketing's Virginia clients show that she

"deliberately engaged in significant or long-term business activities in [Virginia]." Similarly, her

frequent electronic communications and trip to Alexandria show extensive contacts with

Virginia. Accordingly, I find that the Court has specific personal jurisdiction over Shannon

Ashworth. *See Production Group Intern., Inc. v. Goldman*, 337 F. Supp. 2d 788, 796–97 (E.D.

Va. 2004) (finding personal jurisdiction based on defendant's "(i). . . acceptance of employment

with a Virginia-based company, (ii) his regular communications with plaintiff's Virginia-based

colleagues in the course of performing his employment contract, and (iii) his three trips to

plaintiff's Virginia headquarters . . . .").

Similarly, Plaintiff alleges that Brooke, like her mother, was employed by 12 Marketing,

a Virginia based company with a Virginia owner, Dkt. 21 ¶¶ 3, 20–21, communicated, by

telephone and videoconference, with 12 Marketing's Virginia-based owner, *Id.* ¶ 7, and traveled

to Alexandria, VA to meet with Plaintiff, Dkt. 21 ¶¶ 26–27. However, unlike her mother, Plaintiff does not specifically allege that Brooke did work for 12 Marketing's Virginia clients. Still, Brooke's contacts, when viewed together, demonstrate that she availed herself of the privilege of conducting business in Virginia. *See Production Group Intern,* 337 F. Supp. 2d at 796–97. Accordingly, I find that the Court has specific personal jurisdiction over Brooke.

On the other hand, I find that Plaintiff has not alleged facts sufficient for the Court to conclude that Johnny White and Direct Outsource's individual contacts with Virginia subject them to the Court's personal jurisdiction. As to Johnny, Plaintiff argues that the single meeting is sufficient because Johnny purportedly "made false and/or misleading statements that were intended to make Plaintiff believe that [he was] interested in growing Plaintiff's business." Dkt. 21 ¶ 27. But Johnny's alleged statements are only peripherally tied to Plaintiff's claims which revolve around the theft of Plaintiff's trade secrets, not fraud. *See Bird v. Mosaic Glob. Sols., LLC*, 2009 WL 10710612, at *4 (D.S.C. Aug. 13, 2009). And, merely traveling to the forum state does not confer personal jurisdiction. *See Viers v. Mounts*, 466 F. Supp. 187, 191 (W.D. Va. 1979). Similarly, Plaintiff makes no allegations that Direct Outsource had any relevant contacts with the state of Virginia. At most, Plaintiff alleges that Direct Outsource benefited from Shannon and Brooke's actions at the expense of 12 Marketing. But the mere fact that an injury is felt in a forum state is not sufficient to confer jurisdiction. *See Fidrych v. Marriott International, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020). Rather, the "litigation must arise out of" the activities in the forum state. *Id.* at 138.

## 2.    Conspiracy Jurisdiction

Alternatively, 12 Marketing argues that the Court has personal jurisdiction over Johnny and Direct Outsource, despite their lack of individual contacts with Virginia, through the acts of

their co-conspirators. *See* Dkt. 31 at 9. Under a "conspiracy theory of jurisdiction," defendants

"are imputed with constitutionally sufficient contacts with [the forum state] through the actions

of their alleged coconspirators . . . ." *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322, 329

(4th Cir. 2013). To succeed on this theory, Plaintiff must make a plausible claim "(1) that a

conspiracy existed; (2) that [Defendants] participated in the conspiracy; and (3) that a co-

conspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to

subject that conspirator to jurisdiction in Virginia." *Id.* (citation omitted).

I find that 12 Marketing has alleged sufficient facts to support conspiracy jurisdiction. As

to the first element, Defendants argue that there is no conspiracy, because, under Virginia law, a

corporation and its agents cannot conspire between one another.[2] In other words, there cannot be

a conspiracy between Direct Outsource, Brooke, Shannon, Johnny and Calloway because they

are all agents of Direct Outsource. 12 Marketing responds that the intra-corporate immunity does

not apply, because it alleges that Direct Outsource was created to further the conspiracy. Dkt. 32

at 21–22. I agree.

The intra-corporate immunity doctrine does not apply "if an employee, officer, or agent

has an 'independent personal stake' in the conspiracy." *Buffalo Wings Factory, Inc. v. Mohd*, 622

F. Supp. 2d 325, 335 (E.D. Va. 2007) (quoting *Detrick v. Panalpina,* 108 F.3d 529, 544 (4th Cir.

1997). Here, 12 Marketing argues that Defendants began conspiring to steal Plaintiff's trade

secrets *before* they set up Direct Outsource. Dkt. 32 at 21–22. Thus, each defendant had a

personal stake in the conspiracy. 12 Marketing's argument is bolstered by its allegations that

---

[2] Defendants make this argument in their respective motions to dismiss 12 Marketing's business
conspiracy claim under Fed. R. Civ. P. 12(b)(6). *See* Dkt. 24 at 19–20; Dkt. 26 at 12–13. I
address the issue in the context of the Ashworth Defendants' motion to dismiss for lack of
jurisdiction because it goes to the existence of the conspiracy and therefore whether the Court
can exercise jurisdiction over Johnny White and Direct Outsource.

Direct Outsource was formed just weeks before Grindstone was sold to 12 Marketing and just a couple of months before the company alleges Shannon, Brooke and Calloway began funneling 12 Marketing's clients to Direct Outsource. Dkt. 21 ¶¶ 28, 30, 38(a), 44. In the context of a 12(b)(2) motion, where the court must make all reasonable inferences in the plaintiff's favor, I find that the temporal proximity between the formation of Direct Outsource and Defendants' actions is sufficient to conclude that Direct Outsource was created after Defendants entered the conspiracy to further its ends. Therefore, the intra-corporate immunity doctrine does not apply.

I also find that 12 Marketing has otherwise sufficiently alleged the existence of a conspiracy and the two remaining elements of conspiracy jurisdiction—Direct Outsource and Johnny's involvement in the conspiracy and acts in furtherance of the conspiracy in Virginia. 12 Marketing alleges, among other things: Johnny set up Direct Outsource in 2022 to direct business away from Plaintiff, Dkt. 21 ¶¶ 29–30; Johnny travelled to Virginia to meet with 12 Marketing's owners and made misleading statements "intended to make Plaintiff believe that they were interested in growing Plaintiff's business," *Id.* ¶¶ 26–27; while employed by a Virginia company, Shannon, Brooke and Calloway solicited and had meetings with Plaintiff's clients/prospective clients to benefit Direct Outsource, *Id.* ¶¶ 38(a)–(h); and Shannon recruited veteran telemarketers from Plaintiff to work for Direct Outsource, *Id.* ¶ 40.[3] Accordingly, I find that this Court has personal jurisdiction over Johnny and Direct Outsource despite their lack of

---

[3] White disputes these allegations in an affidavit. However, the Fourth Circuit has held that when considering whether the plaintiff has met its burden "of making a prima facie showing in support of its assertion of jurisdiction…, the district court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

individual contacts with Virginia through the acts of their co-conspirators. The motion to dismiss for lack of personal jurisdiction is therefore denied as to all Ashworth Defendants.

**B. Ashworth Defendants' and Calloway's Motions to Dismiss for Failure to State a Claim**

All Defendants move to dismiss 12 Marketing's claims under DTSA and VUTSA and its business conspiracy claim. Additionally, Defendants Johnny White and Shira Calloway move to dismiss 12 Marketing's tortious interference claims.

### 1.    DTSA/VUTSA (Counts I and II)

The DTSA and VUTSA allow an "owner of a trade secret that is misappropriated [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "To prevail on such a claim, a plaintiff must accordingly establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (quoting *Oakwood Labs, LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)); *see 360 Painting, LLC v. Misiph*, 2023 WL 4533932, at *6 (W.D. Va. July 13, 2923).[4] Defendants move to dismiss 12 Marketing's claims under DTSA and VUTSA, alleging that the company failed to allege misappropriation and that its "prospective costumers lists" are not trade secrets. I find that 12 Marketing has satisfied the requirements for pleading claims under the DTSA/VUTSA. Defendants' motions are therefore denied as to Counts I and II.

---

[4] Notably, a claim under the VUTSA does not require proof that the violation affected interstate or foreign commerce. The court in *360 Painting* lists the elements of a claim under the VUTSA as "(1) the information in question constitutes a trade secret; and (2) the defendant's misappropriation of the trade secret." 2023 WL 4533932, at *6.

### a. Misappropriation

Misappropriation involves the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or . . . disclosure or use of a trade secret of another without express or implied consent . . . ." 18 U.S.C. § 1839(5). The "disclosure or use" category requires that the discloser or user (i) "used improper means to acquire knowledge of the trade secret," (ii) "knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who had used improper means to acquire the trade secret," and was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret . . . ," or (iii) "knew or had reason to know that the trade secret was a trade secret," and was "acquired by accident or mistake." *Id.*[5]

### i. Defendants Shannon, Brooke and Calloway

As to Shannon, Brooke, and Calloway, Defendants argue that 12 Marketing fails to allege that any used the company's trade secrets in the purportedly improper communications between Defendants and Plaintiff's clients/prospective clients. *See* Dkt. 24 at 6; Dkt. 26 at 7–8. And, thus, 12 Marketing fails to allege that its trade secrets were misappropriated. 12 Marketing responds that its Complaint, which contains "specific dates of e-mail correspondence between Defendants and Plaintiff's customer and prospective customers," and allegations that "Defendants now work with former customers of Plaintiff that they procured while employed by Plaintiff," is sufficient to raise a reasonable inference of misappropriation under VUTSA. Dkt. 32 at 12–13. I agree and find that 12 Marketing has sufficiently pled misappropriation as to Shannon, Brooke and Calloway.

---

[5] VUTSA's definition of misappropriation is identical. Va. Code § 59.1-336.

In cases like this, in which the alleged trade secrets include client lists and prospective client lists, courts have found the pleading requirements for misappropriation satisfied where the plaintiff alleged the defendant had access to confidential client information, including contact info. etc., and used that information to solicit plaintiff's clients. *See, e.g.*, *Saloman & Ludwin, LLC v. Winters*, 741 F. Supp.3d 398, 404 (E.D. Va. 2024). That is precisely what 12 Marketing has alleged here. For example, the company asserts Brooke, Shannon, and Calloway, "forwarded Plaintiff's client information and or leads to [their Direct Outsource] email accounts," Dkt. 21 ¶ 33, "forwarded emails [from prospective clients] to their Direct Outsource emails and then introduced Direct Outsource to the clients as a subcontractor of Plaintiff," *id.* ¶ 34, and "contacted numerous clients of Plaintiff and solicited the clients for their personal benefit . . . ." *Id.* ¶ 38. These allegations are sufficient to demonstrate misappropriation at the pleading stage.

### ii. Defendant Johnny White

Johnny White argues that 12 Marketing's misappropriation claims should be dismissed as to him because the Complaint contains no specific allegations that he was involved in misappropriating 12 Marketing's trade secrets. I agree.

12 Marketing argues its opposition to the Ashworth Defendants' motion to dismiss that:

> [The Complaint] alleges that Johnny, Shannon's spouse, registered Direct as an Arkansas company the same month that Plaintiff purchased Grindstone (from part-owner Shannon) and its proprietary customer information. Johnny also attended the August 2023 business meeting with Plaintiff, Shannon, and Brooke where the parties discussed Plaintiff's strategy and plans for growing its business. Just two months later, Johnny's spouse, Shannon, had resigned from Plaintiff. Plaintiff alleges that Johnny assists with operating Direct.

Dkt. 32 at 13. However, none of these allegations show that Johnny misused 12 Marketing's client information. Unlike Shannon, Brooke or Calloway, there are no allegations that Johnny contacted 12 Marketing's clients, much less, used 12 Marketing's confidential information to do

so. The fact that Johnny attended a business meeting with his wife is not sufficient to establish misappropriation.

### iii. Defendant Direct Outsource

Direct Outsource argues that 12 Marketing's misappropriation claims should be dismissed as to it because the Complaint contains no specific allegations that the company was involved in the misappropriation of 12 Marketing's trade secrets. While Direct Outsource is correct that there is no allegation of the company's involvement, 12 Marketing has sufficiently alleged that Direct Outsource is vicariously liable for Shannon, Brooke Ashworth, and Calloway's actions.

Under respondeat superior, an employer may be held vicariously liable for the tortious acts of its employee, so long as the employee was conducting business on behalf of his employer and acting within the scope of his employment at the time he committed the acts. *Madison v. Acuna*, 2012 WL 4458510, at *2 (W.D. Va. Aug. 28, 2012). Virginia law establishes a "rebuttable presumption that an employee was acting within the scope of his employment . . . when the plaintiff alleges an employment relationship." *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 477 (Va. 2019).

Here, Plaintiff has alleged that Shannon and Brooke Ashworth were employees/owners off Direct Outsource and that they were using 12 Marketing's confidential information to promote the interest of Direct Outsource. *See e.g.,* Dkt. 21 ¶¶ 35–36, 41. At this stage, that is sufficient to establish vicarious liability.

### b. Prospective Client Lists

Defendants seek to narrow Plaintiff's DTSA and VUTSA claims on the grounds that prospective client leads[6] are not trade secrets as defined by the acts for two reasons: 1) 12 Marketing does not adequately allege the steps it took to keep prospective client leads secret; and 2) there is nothing in the complaint suggesting that prospective client leads had any independent value. *See* Dkt. 24 at 9; Dkt. 26 at 6–7. Neither argument is persuasive at this stage, and I find that 12 Marketing has adequately alleged that it's prospective client leads are trade secrets.

The DTSA defines a trade secret as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . . if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. §1839(3). Similarly, VUTSA defines a trade secret as:

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code Ann. § 59.1-336.

---

[6] The Ashworth Defendants do not contest that the existing customer list and pricing data are trade secrets. Dkt. 34 at 2. And, Calloway conceded during the motions hearing that the existing customer list and pricing data were trade secrets.

Defendants argue that Plaintiff's prospective client list is not a trade secret because 12 Marketing does not allege what steps were taken to ensure the secrecy of prospective client leads, specifically. However, 12 Marketing's complaint describes in detail how it maintained the security of its trade secrets including the prospective client leads. It alleges:

> Plaintiff has taken substantial, ongoing, and more than reasonable steps to keep this business information secret. These steps included restricting its access to employees and agents (that included Shannon, Brook, and Calloway), whose work for Plaintiff required client interaction; and restricting electronic access to such business information to those employees and agents who had authorized secure login information to Plaintiff's network and online database. Plaintiff's client lists, client-specific pricing, and services provided were not and are not available on Plaintiff's website or other public source.

Dkt. 1 ¶ 44. It is clear that "business information" refers to the prior paragraph which describes Plaintiff's trade secrets as "its client lists . . .; non-public information for those initial Grindstone, Inc. and later-acquired clients . . .; and prospective client leads. *Id.* ¶ 43. This is all that is required at this stage. *See United States v. Chung,* 659 F.3d 815, 825–26 (9th Cir. 2011) (noting that "limiting access to a trade secret on a 'need to know basis and controlling plant access'" may constitute reasonable measures).

Defendants also argue that Plaintiff's prospective client list is not a trade secret because it does not derive independent economic value, actual or potential, from not being generally known or readily ascertainable. But the argument ignores the multitude of cases in this Circuit recognizing the economic value of prospective client lists. For example, in *Oros, Inc. v. Dajani,* the plaintiff alleged that the purportedly misappropriated information, "lists of past, present, and prospective clients, together with the pricing and equipment information associated with that clientele," were "subject to reasonable efforts to maintain their secrecy, have independent economic value, are confidential, are not publically [sic] known or available, and are extremely proprietary." 2019 WL 2361047, *4 (E.D. Va. June 4, 2019). In finding these allegations were

sufficient to demonstrate the economic value of a prospective client list at the pleading stage, the court reasoned: "Were competitors to learn exactly which companies [the plaintiff] has targeted with which equipment and at what price, those competitors could systematically underbid or outmaneuver [the plaintiff] and thus gain an economic advance." *Id.*; *see also MicroStrategy v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 424–25 (E.D. Va. 2004) ("would be of value to a competitor that could determine where to apply its resources and who [sic] to target"). Here, 12 Marketing's allegations are virtually identical to those pled in *Oros.* Dkt. 21 at 11–12. Thus, I find that 12 Marketing's prospective client list had independent economic value and is a trade secret.

### 2.    Business Conspiracy (Count V)

The Ashworth Defendants argue that 12 Marketing's business conspiracy claim is barred by the intra-corporate immunity doctrine. Dkt. 24 at 19–20. Alternatively, they argue that the business conspiracy claims should be dismissed as to Johnny, because 12 Marketing has failed to adequately plead Johnny's involvement in the alleged conspiracy. *Id.* at 17–19. As previously discussed, I find that the intra-corporate immunity doctrine does not apply here, and 12 Marketing has sufficiently stated a conspiracy claim against Johnny. *See supra* Part III(A)(2). Accordingly, the Ashworth Defendants' motion to dismiss 12 Marketing's conspiracy claim is denied.

Similarly, Defendant Calloway moves to dismiss the business conspiracy claim under the intra-corporate immunity doctrine. She also argues that the claim should be dismissed because 12 Marketing has not pled "any facts to support the willfulness and maliciousness required to maintain a cause of action under the statute . . . ." Dkt. 26 at 12. To the extent her motion is based on the intra-corporate immunity doctrine, it is denied. *See supra* Part III(A)(2). Likewise,

to the extent her motion is based on failure to plead "willfulness and maliciousness," I find that 12 Marketing has satisfied this element and Calloway's motion is denied.

To state a plausible claim under Virginia Code §§ 18.2-499, 500 a plaintiff must allege sufficient facts to show "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff." *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1984). To satisfy the second element, a "plaintiff is not required to prove actual malice but only legal malice—i.e., 'that the defendant acted intentionally, purposefully, and without lawful justification.'" *Broadhead v. Watterson*, 2016 WL 742127, at *8 (W.D. Va. Feb. 24, 2016) (quoting *Advanced Marine Enters. v. PRC, Inc.*, 501 S.E.2d 148, 155 (Va. 1998)). "Nor is a plaintiff obligated to show that 'a conspirator's primary and overriding purpose is to injure another in his trade or business.'" *Id.* (quoting *Simmons v. Miller*, 544 S.E.2d 666, 677 (Va. 2001)). Here, 12 Marketing has alleged that Calloway and her alleged co-conspirators started a company to compete with Plaintiff, *e.g.* Dkt. 21 ¶ 28, redirected current and prospective clients away from Plaintiff, *e.g. id.* ¶ 38(b)–(h), and "solicited and retained telemarketing agents employed by Plaintiff to work for [her competing company], " *e.g. id.* ¶ 38(i). These allegations are sufficient to demonstrate legal malice at this stage.

### 3.    Tortious Interference (Count IV)

Defendants Calloway and Johnny seek dismissal of 12 Marketing's tortious interference claim. The elements of tortious interference with contract under Virginia law are "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the

party whose relationship or expectancy has been disrupted." *Creech v. Everbank*, 467 F. Supp. 3d 425, 434 (E.D. Va. 2020) (citation omitted). As to Calloway, I find that 12 Marketing has adequately pled these elements. Therefore, her motion is denied. However, as to Johnny, I find 12 Marketing fails to state a claim. Accordingly, his motion is granted.

### i. Defendant Calloway

Calloway argues that Plaintiff has failed to allege any facts showing that she had knowledge of their specific business expectancies. *See* Dkt. 26 at 11 (citing *Mirafuentes v. Estevez*, 2015 Wl 8177935, at *5 (E.D. Va. Nov. 30, 2015). However, 12 Marketing has alleged that Calloway interfered in the company's contracts with specific *existing* clients, while she was the company's Assistant General/Operations Manager. Dkt. 21 ¶¶ 4, 39. At this stage, this is sufficient for the Court to infer that Calloway had knowledge of the relationship between 12 Marketing and its clients at the time she interfered.

### ii. Defendant Johnny White

Johnny moves to dismiss the tortious interference claims against him because the allegations against him are non-specific and conclusory. I agree. The only allegations in the Complaint regarding Johhny are the following:

- Johnny is Shannon's spouse and a business adviser to Direct Outsource, Dkt. 21 ¶ 5;

- Johnny attended a business meeting with Shannon and Brooke in August 2023 and made misleading statements about wanting to help Plaintiff's business grow, *id.* ¶¶ 26–27; and

- Johnny registered Direct Outsource as a competing company in Arkansas, *id.* ¶ 30.

*See also* Dkt. 32 at 18. None of these allegations show that he had any knowledge of 12 Marketing's business relationships or expectancies or are detailed enough to permit the court to infer that Johnny had the requisite knowledge. Thus, Plaintiff has failed to plead a tortious interference claim against Johnny.

### 4.    Exemplary Damages and Attorney's Fees

Finally, the Ashworth Defendants move to dismiss Plaintiff's request for exemplary damages and attorneys' fees under DTSA on the grounds that 12 Marketing did not plead that it provided Defendants with the required notice under 18 U.S.C. § 1833(b)(3)(A). Dkt. 24 at 14–15. 18 U.S.C. § 1833(b)(3)(A) requires an employer to "provide notice of the immunity set forth in [18 U.S.C. § 1833(b)(2)][7] in any contract or agreement with an employee that governs the use of a trade secret or other confidential information." Section 1833(b)(3)(C) further provides that "[i]f an employer does not comply with the notice requirement . . . the employer may not be awarded exemplary damages or attorney fees [under DTSA] in an action against an employee to whom notice was not provided." Plaintiff does not contest that it did not provide the required notice to Ashworth Defendants. Accordingly, its claims for exemplary damages and attorneys' fees under DTSA are dismissed.[8]

---

[7] Whistleblower immunity under 18 U.S.C. § 1833 extends to a narrow set of circumstances that are not applicable here.

[8] Typically, courts do not dismiss claims for particular damages or remedies at the motion to dismiss stage. *See Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 629 (W.D. Va. 2014). However, other courts reviewing this question have treated the notice as a pleading requirement. *E.g.*, *Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.,* 2020 WL 6118494, at *3 (N.D. Cal. Oct. 16, 2020). Accordingly, it is appropriate to dismiss Plaintiffs claims for exemplary damages and attorneys' fees under the DTSA at this stage.

**CONCLUSION**

For all these reasons,  the Ashworth Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED**. The Ashworth Defendants' motion to dismiss for failure to state a claim is **DENIED IN PART** and **GRANTED IN PART**. As to Johnny, the Ashworth Defendants' motion to dismiss the tortious interference with business relationship (Count IV) claim is **GRANTED** and the claims are dismissed without prejudice and with leave to amend. The Ashworth Defendants' motion to dismiss the claim for attorneys' fees and exemplary damages is **GRANTED**. The Ashworth Defendants' motion to dismiss the VUTSA/DTSA claims (Counts I & II) and the Ashworth Defendants' motion to dismiss the business conspiracy claim (Count V) is **DENIED**. Defendant Shira Calloway's motion to dismiss is **DENIED.**

Entered:  August 7, 2025

*Robert S. Ballou*

Robert S. Ballou
United States District Judge